**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

STEPHEN BULL, Derivatively and on Behalf of ARROW FINANCIAL CORPORATION,

Plaintiff,

v.

THOMAS J. MURPHY, PENKO K. IVANOV, EDWARD J. CAMPANELLA, WILLIAM L. OWENS, MARK L. BEHAN, TENEE R. CASACCIO, GREGORY J. CHAMPION, GARY C. DAKE, DAVID G. KRUCZLNICKI, ELIZABETH A. MILLER, RAYMOND F. O'CONOR, and COLIN L. READ,

Defendants,

and,

ARROW FINANCIAL CORPORATION

Nominal Defendant.

Case No: 1:23-cv-1566 (AMN/DJS)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT, FEE AND EXPENSE AMOUNT, AND SERVICE AWARD**

**TABLE OF CONTENTS**

I. INTRODUCTION ........ 1

II. BACKGROUND OF THE DERIVATIVE ACTION ........ 2

III. PRELIMINARY APPROVAL GRANTED AND NOTICE PROVIDED ........ 4

IV. THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL ........ 5

A. The Settlement is Procedurally Fair ........ 6

B. The Settlement is Substantively Fair ........ 8

1. *The Settlement Provides Substantial Benefits to Arrow and Its Stockholders* ........ 9

2. *Likelihood of Success and Risks of Continued Litigation* ........ 11

3. *Shareholder Reaction* ........ 14

V. THE REQUESTED FEE AND EXPENSE AMOUNT SHOULD BE APPROVED ........ 14

A. The Benefit Recovered ........ 16

B. The Magnitude and Complexities of Risky Litigation ........ 18

C. Quality of Representation ........ 20

D. Public Policy Considerations ........ 20

E. The Time and Labor Expended by Plaintiff's Counsel ........ 21

VI. THE SERVICE AWARD SHOULD BE APPROVED ........ 24

VII. CONCLUSION ........ 25

# TABLE OF AUTHORITIES

## CASES

*Ashe v. Arrow Financial Corporation, et al.*,
Case No. 1:23-cv-00764-AMN-DJS (N.D.N.Y.) ............ *passim*

*Bell Atlantic Corp. v. Bolger*,
2 F.3d 1304 (3d Cir. 1993)............ 9

*Allred v. Walker*,
2021 U.S. Dist. LEXIS 236249 (S.D.N.Y. Dec. 9, 2021) ............ 13, 24

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) ............ 14

*Brooks v. Am. Exp. Indus., Inc.*,
1977 U.S. Dist. LEXIS 17313 (S.D.N.Y. Feb. 17, 1977) ............ 8

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974) ............ 8

*City of Providence v. Aeropostale, Inc.*,
2014 U.S. Dist. LEXIS 64517 (S.D.N.Y. May 9, 2014) ............ 21

*Cnty. of New York Employees Retirement Plan et al. v. Jung*,
Index No. 651304/2010 (N.Y. Sup. Ct. Aug. 18, 2010) ............ 17

*Cohn v. Nelson*,
375 F. Supp. 2d 844 (E.D. Mo. 2005) ............ 9, 10, 21

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001) ............ 6

*Eileen Grays LLC v. Remix Lighting, Inc.*,
2019 U.S. Dist. LEXIS 209445 (N.D.N.Y. Dec. 5, 2019) ............ 22

*Faber, et al. v. Cornell University*,
Case No. 3:20-cv-00467 (N.D.N.Y. Oct. 26, 2023) ............ 22

*Guevoura Fund Ltd. v. Sillerman*,
2019 U.S. Dist. LEXIS 218116 (S.D.N.Y. Dec. 18, 2019) ............ 6

*In re 22nd Century Group, Inc. Derivative Litig.*,
Case No. 1:19-cv-00479-JLS (W.D.N.Y. 2025)............ 18, 23, 24

*In re AOL Time Warner S'holder Derivative Litig.*,
2006 U.S. Dist. LEXIS 63260 (S.D.N.Y. Sept. 6, 2006) ....................5, 11, 12, 13

*In re AOL Time Warner S'holder Derivative Litig*,
2009 U.S. Dist. LEXIS 124372 (S.D.N.Y. Feb. 1, 2010) ....................21

*In re CPI Aerostructures S'holder Derivative Litig.*,
2023 U.S. Dist. LEXIS 194625 (E.D.N.Y. Oct. 27, 2023).................... *passim*

*In re Fab Universal Corp. S'holder Derivative Litig.*,
148 F. Supp. 3d 277 (S.D.N.Y. 2015).................... *passim*

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
2015 U.S. Dist. LEXIS 152668 (S.D.N.Y. Nov. 9, 2015) ....................19

*In re Geron Corp. S'holder Derivative Litig.*,
2023 Del. Ch. LEXIS 178 (Del. Ch. May 17, 2023) ....................18

*In re Johnson & Johnson Derivative Litig.*,
900 F. Supp. 2d 467 (D.N.J. 2012) ....................9

*In re Lloyd's Am. Tr. Fund Litig.*,
2002 U.S. Dist. LEXIS 22663 (S.D.N.Y. Nov. 26, 2002) ....................13

*In re Metropolitan Life Derivative Litig.*,
935 F. Supp. 286 (S.D.N.Y. July 16, 1996) ....................5, 14

*In re Namenda Direct Purchaser Antitrust Litig.*,
462 F. Supp. 3d 307 (S.D.N.Y. May 27, 2020) ....................13

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) ....................21

*In re OSI Sys., Inc. Derivative Litig.*,
2017 U.S. Dist. LEXIS 221033 (C.D. Cal. May 2, 2017) ....................18

*In re Pac. Enters. Sec. Litig.*,
47 F.3d 373 (9th Cir. 1995) ....................13

*In re Peloton Interactive, Inc.*,
2025 U.S. Dist. LEXIS 125500 (E.D.N.Y. Jul. 1, 2025) ....................9, 14

*In re Pfizer, Inc. S'holder Derivative Litig.*,
780 F. Supp. 2d 336 (S.D.N.Y. 2011)....................6, 9

*In re Presidential Life Sec.*,
857 F. Supp. 331 (S.D.N.Y. 1994) ....................25

*In re WorldCom, Inc. Sec. Litig.*,
388 F. Supp. 2d 319 (S.D.N.Y. 2005) ....................21

*Ingrao v. Fieldly, et al.*,
Case No. A-23-8737360C (Nev. Dist. Ct. Mar. 26, 2025) ....................18

*James v. China Grill Mgmt.*,
2019 U.S. Dist. LEXIS 72759 (S.D.N.Y. Apr. 30, 2019) ....................21

*Kamen v. Kemper Fin. Servs. Inc.*,
500 U.S. 90 (1991) ....................12, 20

*Koeller, et al. v. Numrich Gun Parts Corp.*,
Case No. 1:22-cv-00675-DNH-CFH (N.D.N.Y. May 31, 2024)....................22

*Maley v. Dale Global Techs. Corp.*,
186 F. Supp. 2d 358 (S.D.N.Y. 2002) ....................21

*Mathes v. Roberts*,
85 F.R.D. 710 (S.D.N.Y. 1980) .................... 5, 11

*Merholz v. McMahon*,
3:20-cv-00557 (D. Conn. 2021)....................17

*Mills v. Elec. Auto-Lite Co.*,
396 U.S. 375 (1970) ....................9, 14

*Pacheco v. Guyer*,
Case No. 1:18-cv-7999 (S.D.N.Y. Jan. 27, 2023) ....................17

*Pickard v. Onsite Facility Servs., LLC., et al.*,
Case No. 5:22-cv-207 (AMN/ML) (N.D.N.Y. Oct. 25, 2023) ....................20, 22

*Regina M. v. Comm'r of Soc. Sec.*,
2024 U.S. Dist. LEXIS 68687 (N.D.N.Y. Apr. 16, 2024) ....................23

*Republic Nat. Life Ins. Co. v. Beasley*,
73 F.R.D. 658 (S.D.N.Y. Feb. 24, 1977) ....................19

*Roberts v. Navios Mar. Holdings, Inc.*,
2017 U.S. Dist. LEXIS 157503 (S.D.N.Y. Sept. 26, 2017) ....................15

*Sciabacucchi v. Howley*,
2023 Del. Ch. LEXIS 164 (Del. Ch. July 3, 2023)....................24

*Schimmel v. Goldman*,
57 F.R.D. 481 (S.D.N.Y. 1973) ....................5

*Scott v. Wei*,
2021 U.S. Dist. LEXIS 90861 (S.D.N.Y. May 12, 2021) ....................5, 6, 24

*Velez v. Novartis Pharms. Corp.*,
2010 U.S. Dist. LEXIS 125945 (S.D.N.Y. Nov. 30, 2010) ....................22

*Wal-Mart Stores, Inc. v. Visa, U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005) ....................21

*Weinberger v. Kendrick*,
698 F.2d 61 (2d Cir. 1982) ....................5

*Zerkle v. Cleveland-Cliffs Iron Co.*,
52 F.R.D. 151 (S.D.N.Y. 1971) ....................12

**RULES AND STATUTES**

Fed. R. Civ. P. 23.1 .................... *passim*

**OTHER MATERIAL**

Laarni T. Bulan, et al., *Parallel Derivative Action Settlements Update: August 2025*, Cornerstone Research (Aug. 2025) ....................18

## I. INTRODUCTION

Pursuant to Fed. R. Civ. P. 23.1(c) and the Stipulation and Agreement of Settlement dated April 30, 2025 (ECF No. 22-3, the "Stipulation" or "Stip."), plaintiff Stephen Bull ("Plaintiff") in the above-captioned consolidated stockholder derivative suit (the "Action") brought on behalf of Arrow Financial Corp. ("Arrow" or the "Company"), respectfully submits this Memorandum of Law in support of his accompanying Motion for Final Approval of Settlement, Fee and Expense Amount, and Service Award (the "Motion").[1]

As detailed herein, the proposed Settlement resolves claims asserted against the Individual Defendants, who are current and former officers and directors of the Company, for alleged breaches of fiduciary duties. The Settlement is the result of extensive arm's-length negotiations conducted by competent and experienced counsel which culminated in an agreement to resolve this Action in exchange for the implementation of certain Corporate Governance Reforms (the "Reforms") detailed in Exhibit A to the Stipulation.

As explained at preliminary approval, the Reforms include: (i) enhancements to the Company's Disclosure Committee Charter; (ii) improvements to the Compensation Committee's charter; (iii) improvements to the Governance Committee and its risk oversight responsibilities, as well as additional requirements for director nominations; (iv) enhancements to the Company's Enterprise Risk Management Group; (v) improvements to the Company's Director of Compliance and Risk ("DoCR"); and (vi) implementation of annual director training. *See* Stip., Ex. A, §I. For the reasons set forth in Plaintiff's motion for preliminary approval, the Reforms directly address the alleged wrongdoing in the Action, strengthen the Company's overall governance practices, and

---

[1] All capitalized terms not otherwise defined have the same meaning as in the Stipulation. ECF No. 22-3.

will help ensure that future similar conduct does not recur. *See* ECF No. 22-1, at 9-12; *see also* Declaration of Thomas J. McKenna ("McKenna Decl."), Ex. A, Declaration of Professor Korsmo ("Korsmo Decl."), at ¶¶30-31, 47-52.

Arrow acknowledges and agrees that the filing and pendency of the Action, and the settlement of the Action, were a material cause of the Company's decision to adopt, implement, and maintain the Reforms. *See* Stip., Ex. A. The independent members of the Board have likewise unanimously determined that the Settlement and each of its terms are fair, reasonable, and in the best interests of the Company and its stockholders, and that the Settlement, including the Reforms, confers substantial benefits upon the same. Stip., ¶1.4.

On October 22, 2025, the Court entered the Preliminary Approval Order, preliminarily approving the Settlement, approving the form and manner of Notice, and scheduling the Settlement Hearing. *See* ECF No. 25. Consistent with the requirements of Fed. R. Civ. P. 23.1 and due process standards, and in accordance with the Court's Preliminary Approval Order, Arrow disseminated Notice of the Settlement to Current Arrow Stockholders by the November 5, 2025 deadline. *See* ECF No. 25. To date, no objections have been filed with the Court or received by Plaintiff's Counsel. *See* McKenna Decl., ¶17.

For the reasons discussed herein and in the accompanying submissions, Plaintiff respectfully submits that the Settlement is fair, reasonable, and adequate, and should be approved in its entirety, including as to the requested Fee and Expense Amount and requested Service Award for Plaintiff.

## II. BACKGROUND OF THE DERIVATIVE ACTION

A detailed summary of the factual allegations and procedural history of the Action, Plaintiff's Counsel's investigation and efforts, the settlement negotiations, and the Settlement

consideration is set forth in Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Preliminary Approval of Settlement (ECF No. 22-1), the Stipulation (ECF No. 22-3) and the accompanying Declaration. ECF No. 22-2. To avoid needless repetition, Plaintiff incorporates those filings by reference and provides the following summary relevant to the instant Motion.

The Action arises from the Individual Defendants' alleged breaches of fiduciary duty which, in turn, caused harm to the Company. Specifically, the breaches of fiduciary duty related to Arrow's defective disclosure controls and internal controls over financial reporting, which ultimately led to Arrow being unable to timely file its periodic financial reports, putting Arrow at an increased risk of being delisted. *See* McKenna Decl., ¶5. The Individual Defendants also allegedly failed to disclose these adverse material facts in Arrow's public statements. *Id*.

On December 12, 2023, Plaintiff filed the Action on behalf of Arrow. ECF No. 1. Thereafter, Plaintiff's Counsel and Defendants' Counsel negotiated the terms of a stay pending the resolution of the motion to dismiss in the Securities Class Action[2], which was filed on March 5, 2024 and granted by the Court on March 11, 2024. ECF Nos. 13, 15.

In or around April 2024, the Parties conferred and engaged in arm's-length negotiations to assess whether a resolution could be reached and, if so, on what terms. Over the ensuing months, the Parties engaged in numerous discussions and negotiations which saw, *inter alia*, (i) the Parties share information regarding the claims and the Company's existing governance practices; (ii) Defendants produce certain internal corporate governance documents to Plaintiff; (iii) the Parties exchange several settlement proposals and counterproposals that targeted gaps in the Company's corporate governance focusing directly on the allegations in the Action; and (iv) a number of meet

---

[2] "Securities Class Action" refers to the class action captioned *Ashe v. Arrow Financial Corporation, et al.*, Case No. 1:23-cv-00764-AMN-DJS (N.D.N.Y.).

and confers between the Parties to discuss the settlement proposals and counterproposals. McKenna Decl., ¶8. Finally, after months of hard-fought negotiations, the Parties ultimately reached an agreement in principle to resolve the Action in exchange for certain corporate governance reforms (*i.e.*, the Reforms) on September 16, 2024 (the "Settlement"). *Id.*, ¶9.

Following this, the Parties began negotiating an appropriate amount of attorneys' fees and expenses (*i.e.*, the Fee and Expense Amount) that Defendants would pay Plaintiff's Counsel commensurate with the value of the substantial benefits conferred on Arrow and its stockholders by the Settlement and the contributions of Plaintiff's Counsel to the Settlement. *Id.*, ¶10. Early into these negotiations, however, a disagreement arose regarding certain aspects of the proposed Settlement. As a result, the fee negotiations immediately ceased and, to avoid any uncertainty moving forward, the Parties negotiated the material terms of the Settlement in a binding written Term Sheet, which was subject to several rounds of back-and-forth revisions by the Parties. The Term Sheet was finalized on or around December 27, 2024, and then approved by the Company's Board of Directors (the "Board") on January 29, 2025. *Id.*, ¶11.

Following this, the Parties resumed their negotiations regarding the appropriate Fee and Expense Amount. Despite a number of exchanges, the Parties were unable to reach an agreement. Accordingly, Plaintiff requests a reasonable Fee and Expense Amount by this Motion (*see* § V, *infra*), and Defendants have reserved their right to oppose. McKenna Decl., ¶12.

## III. PRELIMINARY APPROVAL GRANTED AND NOTICE PROVIDED

On October 22, 2025, the Court granted preliminary approval of the Settlement and directed the Company to give Notice to Current Arrow Stockholders. ECF No. 25. On November 5, 2025, pursuant to paragraph 3 of the preliminary approval order (*id.*), the Company gave Notice by: (i) posting a copy of the Notice and Stipulation and its exhibits on the Company's investor

relations website; (ii) issuing a press release with *PRNewswire*; and (iii) filing the Notice and Stipulation and its supporting exhibits as exhibits to a Form 8-K Current Report with the SEC. McKenna Decl., ¶16.

The date for any Current Arrow Stockholder to object to the Settlement is December 22, 2025. ECF No. 25, ¶¶7, 10. Plaintiff will address any objections, or lack thereof, after such date. However, to date, Plaintiff has not received any objections to the Settlement, nor have any objections been filed on the Court's docket. McKenna Decl., ¶17.

## IV. THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL

A derivative action "may be settled … only with the court's approval. Notice of a proposed settlement, voluntary dismissal, or compromise must be given to stockholders or members in the manner that the court orders." Fed. R. Civ. P. 23.1(c). Courts in this Circuit routinely encourage settlements of complex litigation, such as shareholder derivative actions. *See In re AOL Time Warner S'holder Derivative Litig.*, 2006 U.S. Dist. LEXIS 63260, at *7-8 (S.D.N.Y. Sept. 6, 2006); *In re Metropolitan Life Derivative Litig.*, 935 F. Supp. 286, 291 (S.D.N.Y. July 16, 1996) ("Public policy, of course, favors settlement."); *Mathes v. Roberts*, 85 F.R.D. 710, 713 (S.D.N.Y. 1980) (favoring settlements of derivative cases because such actions are "notoriously difficult and unpredictable") (quoting *Schimmel v. Goldman*, 57 F.R.D. 481, 487 (S.D.N.Y. 1973)).

Final approval is warranted if "the compromise fairly and adequately serves the interests of the corporation on whose behalf the derivative action was instituted." *In re AOL*, 2006 U.S. Dist. LEXIS 63260, at *6. "As in the class action settlement approval context, '[t]he central question … is whether the compromise is fair, reasonable and adequate.'" *Scott v. Wei*, 2021 U.S. Dist. LEXIS 90861, at *2 (S.D.N.Y. May 12, 2021) (quoting *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982)). In granting preliminary approval of the Settlement, this Court found that,

on a preliminary review, "the proposed settlement falls within the range of possible approval criteria, as it provides a beneficial result for the Company and its shareholders, and appears to be the product of serious, informed, non-collusive negotiations." ECF No. 25 at 11.

At this final approval stage, "the Court must consider whether the settlement was procedurally fair—*i.e.*, whether it was the result of arm's-length negotiations and whether Plaintiffs' counsel adequately and effectively represented the interests of the shareholder class—and whether the substantive terms of the settlement 'are in the interests of the company and its shareholders relative to the likely rewards of litigation.'" *Scott*, 2021 U.S. Dist. LEXIS 90861, at *2-3 (quoting *In re Pfizer, Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 340 (S.D.N.Y. 2011)). Plaintiff submits that the Settlement is both procedurally fair and substantively fair, such that final approval is warranted.

### A. <u>The Settlement is Procedurally Fair</u>

"When engaging in this analysis, district courts 'must pay close attention to the negotiating process.'" *Scott*, 2021 U.S. Dist. LEXIS 90861, at *3 (quoting *In re Fab Universal Corp. S'holder Derivative Litig.*, 148 F. Supp. 3d 277, 280-81 (S.D.N.Y. 2015)). In doing so, courts in this Circuit focus on whether the settlement was reached through good faith bargaining at arm's length without collusion. *See, e.g.*, *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85-86 (2d Cir. 2001). "A strong initial presumption of fairness attaches to a proposed settlement if it is reached by experienced counsel after arm's-length negotiations, and great weight is accorded to counsel's recommendation." *Guevoura Fund Ltd. v. Sillerman*, 2019 U.S. Dist. LEXIS 218116, at *16 (S.D.N.Y. Dec. 18, 2019).

"Here, the indicia of procedural fairness are demonstrated by the fact that the Settlement was the product of extensive arm's length negotiations by experienced Lead Counsel … who

thoroughly investigated the facts and the law and considered the risks of a further prosecution." *In re CPI Aerostructures S'holder Derivative Litig.*, 2023 U.S. Dist. LEXIS 194625, at *8 (E.D.N.Y. Oct. 27, 2023). Prior to settlement discussions, Plaintiff's Counsel conducted extensive investigation and analysis, including the following: (i) reviewed and analyzed Arrow's public filings with the U.S. Securities and Exchange Commission (the "SEC"), press releases, announcements, transcripts of investor conference calls, and news articles; (ii) reviewed and analyzed securities analyst, business, and financial media reports about Arrow; (iii) reviewed the filings and proceedings in the related Securities Class Action; (iv) researched the applicable law with respect to the claims asserted (or which could be asserted) in the Action and the potential defenses thereto; and (v) researched, drafted, and filed a complaint. McKenna Decl., ¶20; Stip., § III.

Thereafter, Plaintiff's Counsel reviewed and assessed the Company's existing corporate governance practices and crafted a comprehensive settlement demand, which included an analysis of the claims and damages, and which proposed a framework to assist with the settlement negotiations by targeting gaps in Arrow's corporate governance. Stip., § II.C. Subsequently, Plaintiff's Counsel: (i) engaged in numerous discussions with Defendants' Counsel regarding the settlement demand; (ii) negotiated the terms of a document production for settlement purposes; (iii) received and reviewed five Company internal corporate governance documents comprising a total of one hundred and twelve pages produced in connection with the settlement negotiations; (iv) modified the settlement demands over the course of the Parties' settlement negotiations; (v) engaged in back-and-forth settlement negotiations with Defendant's Counsel for several months, which involved significant give-and-take on both sides as well as a firm understanding of the respective strengths and weaknesses of the Action, before reaching an agreement in principle to

settle the Action; (vi) drafted and negotiated the terms of a settlement term sheet to memorialize the essential terms of the Settlement; (vii) drafted the necessary settlement documentation and negotiated its terms for its submission to the Court for approval of the Settlement; and (viii) communicated with Plaintiff throughout the prosecution of the Derivative Action and the settlement process. McKenna Decl., ¶21; Stip., § III.

The Parties were well-equipped to assess the strengths and weaknesses of their respective cases and the resulting Settlement; drawing upon not just their extensive experience in this type of complex derivative litigation, but also from the information gathered during the Parties' settlement negotiations, including the review of the Company's confidential internal corporate governance documents. McKenna Decl., ¶22. Thus, as this Court found at preliminary approval, "[f]or these reasons, … Plaintiff has satisfied the procedural fairness requirement." ECF No. 25, at 8.

Additionally, courts give substantial deference to directors' exercise of independent business judgment in approving settlements such as the Action. *See* Stip., ¶1.4; *Brooks v. Am. Exp. Indus., Inc.*, 1977 U.S. Dist. LEXIS 17313, at *10 (S.D.N.Y. Feb. 17, 1977) ("[T]he decision of the [] board to approve this settlement is appropriately afforded certain deference; it is a business judgment with presumptive validity."). *See* Stip., ¶1.4.

These facts demonstrate that the Settlement is procedurally and presumptively fair as it was reached after negotiations at arm's-length, in good faith, and free of collusion.

### B. <u>The Settlement Is Substantively Fair</u>

In considering whether a proposed settlement is fair, reasonable, and adequate, courts in the Second Circuit rely upon the "*Grinnell* factors" set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 456 (2d Cir. 1974) ("*Grinnell*"). In the context of a derivative action, these factors consider: "(1) the reasonableness of the benefits achieved by the settlement in light of the potential

recovery at trial; (2) the likelihood of success in light of the risks posed by continued litigation; (3) the likely duration and cost of continued litigation; and (4) any shareholder objections to proposed settlement." *CPI*, 2023 U.S. Dist. LEXIS 194625, at *11 (quoting *Fab Universal*, 148 F. Supp. 3d at 281); *see also Pfizer*, 780 F. Supp. 2d at 340.

***1. The Settlement Provides Substantial Benefits to Arrow and Its Stockholders***

"The 'principal factor' for the Court to consider in assessing the reasonableness of the Settlement is 'the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest.'" *CPI*, 2023 U.S. Dist. LEXIS 194625, at *12 (quoting *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993)). As held by the United States Supreme Court, corporate governance changes provide ample support for settlement approval; the benefit conferred need not be pecuniary in nature in order to be deemed substantial. *See Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 396 (1970); *see also In re Peloton Interactive, Inc.*, 2025 U.S. Dist. LEXIS 125500, at *5 (E.D.N.Y. Jul. 1, 2025) ("In evaluating the benefits achieved in a derivative settlement, a range of reasonableness exists, and a monetary benefit is not necessary for settlement approval."); *In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 480 (D.N.J. 2012) ("[A]n empirical study of shareholder derivative actions concluded that the overwhelming majority of settlements result solely in corporate governance changes like those presented here."); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 853 (E.D. Mo. 2005) (reforms designed to reduce the probability of recurrence of alleged wrongdoing "provide valuable benefits to public companies").

As detailed at the preliminary approval stage, courts recognize that public corporations and their stockholders may receive a "substantial benefit" through the adoption of corporate therapeutics similar to the Reforms agreed to in the Stipulation and described above. *See Mills*, 396 U.S. at 395-96 ("[A] corporation may receive a 'substantial benefit' from a derivative suit …

regardless of whether the benefit is pecuniary in nature."); *see also* Korsmo Decl., ¶10 ("governance improvements that reduce the risk of future misconduct and mismanagement are likely to be of far greater value to the company and its stockholders than any plausible monetary recovery."). This is also supported by a volume of academic literature. *See* ECF Nos. 22-5—15.

Here, the Settlement provides immediate and long-lasting benefits to the Company by way of the Reforms, which shall be implemented within thirty (30) days of the entry of this Court's Judgment and be maintained for a period of no less than five (5) years. *Cohn*, 375 F. Supp. 2d at 850 (finding that corporate governance measures in place for no less than three years will "provide meaningful ways of avoiding the problems [the company] experienced in the recent past."). These Reforms will also provide substantial benefits to the Company because, among other things, (i) "they transform the disclosure, compliance, and operational mechanisms at the Company and can be expected to meaningfully reduce the possibility of future wrongful conduct of the types alleged in the Complaint, together with similar types of conduct" (Korsmo Decl., ¶24), (ii) will "generate a significantly more informed board and a comprehensive system for preventing, detecting, reporting, and correcting misconduct like that alleged in the Action" (*id.*, ¶30), and (iii) "make a recurrence far less likely." *Id.*, ¶52. As such, "the Settlement provides significant value to the Company and its stockholders,"[3] with "extremely conservative" estimates giving the Reforms "a value in excess of $5 million." *Id.*, ¶25; *see also id.*, ¶¶29, 52-53, 60.

Furthermore, as "the Court agree[d]," (ECF No. 25, at 9), the Reforms specifically address Plaintiff's allegations in the Action, particularly as they relate to the alleged issuance of false and

[3] Indeed, the Board approved a resolution "reflecting its determination, in a good faith exercise of its business judgment, that the Settlement and each of its terms are fair, reasonable, and in the best interests of the Company and its stockholders, and that the Settlement, including the Reforms, confers substantial benefits upon the Company and its stockholders." Stip., ¶1.4.

misleading statements, alleged internal control deficiencies, and the alleged failings of the officers and directors to prevent the misconduct. The Reforms will strengthen the Company's internal control function, providing checks-and-balances on the Company's executives, ensuring all public statements are accurate, full, and truthful, and ensuring the Board is dedicated to the furtherance of the Company's mission-critical aims; and thereby reducing the likelihood that lapses similar to the alleged misconduct will recur in the future. McKenna Decl., ¶26; Korsmo Decl., ¶¶29-30, 47-52. For this reason, the Reforms bring significant value to the Company. *See In re AOL*, 2006 U.S. Dist. LEXIS 63260, at *11 (finding a derivative settlement conferred substantial benefits where "more importantly, the governance and compliance provisions memorialized in the Settlement directly address the failure of internal controls that precipitated the instant lawsuits"); *see Fab Universal*, 148 F. Supp. 3d at 282 ("It is even less likely that any damages established would achieve more benefits for the Company (or even the same amount) than are assured by the governance reforms achieved by this settlement…. Therefore, this factor weighs in favor of settlement approval.").

In addition, the Settlement frees Company resources and time that would otherwise be spent on litigating the Action to instead strengthen Arrow's internal controls and operations. *See In re AOL*, 2006 U.S. Dist. LEXIS 63260, at *15-16 ("Termination of the litigation at this stage of the proceedings 'obviat[es] the expenditure of any future time and expense in connection with this action,' and will allow the Company to direct its full attention to its substantive business.") (quoting *Mathes*, 85 F.R.D. at 714). Accordingly, the substantial benefits achieved demonstrate the reasonableness of the Settlement.

***2. Likelihood of Success and Risks of Continued Litigation***

While Plaintiff and his counsel believe that the claims alleged in the Action are meritorious and that their investigation thus far supports this belief, derivative litigation is "notably difficult and unpredictable." *Zerkle v. Cleveland-Cliffs Iron Co.*, 52 F.R.D. 151, 159 (S.D.N.Y. 1971); *In re AOL*, 2006 U.S. Dist. LEXIS 63260, at *8.

The Action was temporarily stayed pending the resolution of the Securities Class Action. Upon expiration of the stay, litigation would ensue and Plaintiff faced the risk that the Action might not have withstood challenges at the pleading stage, especially given the difficult standards for pleading demand futility under Federal Rule of Civil Procedure 23.1. *See Fab Universal*, 148 F. Supp. 3d at 281-82 ("The doctrine of demand futility … and the generally uncertain prospect of establishing a breach of fiduciary duties combine to make stockholder derivative suits an infamously uphill battle for plaintiffs."); *see also Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 96 (1991) (establishing demand futility requires "extraordinary conditions"). Indeed, to prevail, Plaintiff would need to establish demand futility as to at least five (5) of Arrow's ten (10) directors when the complaint was filed, several of whom the Company deemed independent. Assuming Plaintiff satisfied Rule 23.1, he would still face challenges as to whether he adequately stated claims under Rule 12(b)(6).

Even if Plaintiff overcame these pleadings-stage hurdles, he would face significant costs and risks in attempting to improve the result obtained here through further litigation. Continued litigation would be protracted and expensive for both parties, considering the complexity, uncertainty, and risks inherent in the Action, including the very real risk of no recovery. *See* McKenna Decl., ¶30. "Litigation of Plaintiff['s] claims through trial and an appeal would have been extremely time-consuming and expensive. Plaintiff[] would have had to engage in extensive document discovery, taken numerous depositions, and had to retain experts and take the

depositions of experts for the defendants. Litigation would not have ended any time soon." *Allred v. Walker*, 2021 U.S. Dist. LEXIS 236249, at *14 (S.D.N.Y. Dec. 9, 2021). Further, Plaintiff would have faced the risk of potential loss on summary judgment, and the inherent risks of trial, should the case progress that far. Indeed, "derivative lawsuits are rarely successful." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). "Moreover, whichever side lost at trial surely would have appealed (most likely after filing extensive post-trial motions). … Such continued litigation would have required further time and resources with no certainty of a favorable outcome." *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F. Supp. 3d 307, 312 (S.D.N.Y. May 27, 2020).

Moreover, the amount of recoverable damages would have posed significant issues and would have been subject to further litigation. *See In re AOL*, 2006 U.S. Dist. LEXIS 63260, at *15 ("Even assuming that Plaintiffs were able to successfully establish the defendants' liability, they then would be tasked with proving highly contested damages."); *In re Lloyd's Am. Tr. Fund Litig.*, 2002 U.S. Dist. LEXIS 22663, at *61 (S.D.N.Y. Nov. 26, 2002) ("The determination of damages … is a complicated and uncertain process, typically involving conflicting expert opinions," making the outcome "highly unpredictable."). "In short, continued litigation poses numerous risks." ECF No. 25, at 10; *see also Allred*, 2021 U.S. Dist. LEXIS 236249, at *12-13 (citing cases noting the difficulties of "proving demand futility and breach of fiduciary duty, overcoming the substantial protection of the business judgment rule, and the task of proving highly contested damages.").

The Settlement eliminates these and other risks, including the risk of no recovery for the Company after potentially years of litigation, while ensuring that the Company and its stockholders obtain immediate and substantial benefits through the Reforms. "This is particularly true in light of the relatively early stage of this litigation, as further litigation would likely be protracted and

costly." *CPI*, 2023 U.S. Dist. LEXIS 194625, at *18 (citing *In re Metropolitan Life Derivative Litig.*, 935 F. Supp. at 293-94).

***3. Shareholder Reaction***

Notice was timely disseminated to Current Arrow Stockholders on November 5, 2025. Objections to the proposed Settlement are due by December 22, 2025. ECF No. 25, ¶¶7, 10. To date, no objections have been received by the Plaintiff nor filed on the Court's docket. McKenna Decl., ¶35. The absence of any objections to date suggests that Current Arrow Stockholders are satisfied with the Settlement. As such, this factor "weighs heavily in favor of final approval." *CPI*, 2023 U.S. Dist. LEXIS 194625, at *19.

In sum, as reflected by the foregoing discussion, the proposed Settlement is both procedurally and substantively fair, adequate, and reasonable, and thus warrants final approval.

**V. THE REQUESTED FEE AND EXPENSE AMOUNT SHOULD BE APPROVED**

"Counsel who successfully prosecute a shareholder derivative action that generates substantial benefits for the corporation are entitled to an award of attorneys' fees commensurate with the risks and benefits of the action." *CPI*, 2023 U.S. Dist. LEXIS 194625, at *19; *see also Mills*, 396 U.S. at 395-96; *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980). It is undisputed that "a corporation may receive a 'substantial benefit' from a derivative action, justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature" because "corporate therapeutics" can "furnish a benefit to all shareholders." *Mills*, 396 U.S. at 395-96; *In re Peloton*, 2025 U.S. Dist. LEXIS 125500, at *5 ("It is by now … well established that an award of counsel fees is only justified where the derivative action results in a substantial non-monetary benefit to a corporation") (quoting *Fab Universal*, 148 F. Supp. 3d at 283). Under the corporate benefit doctrine, courts have discretion "to approve an award of attorneys' fees for a shareholder suit

against a corporation where, although not resulting in a monetary benefit, the action substantially benefits the corporation or the stockholders in the aggregate." *Roberts v. Navios Mar. Holdings, Inc.*, 2017 U.S. Dist. LEXIS 157503, at *13 (S.D.N.Y. Sept. 26, 2017).

Here, "Arrow acknowledges and agrees that the Settlement confers substantial benefits upon it and its stockholders, and, as such, Plaintiff's Counsel are entitled to an award of reasonable attorneys' fees and expenses in an amount commensurate with the value of the Settlement's benefits and the risks assumed by Plaintiff's Counsel in pursuing the Action on a wholly contingent basis." Stip., ¶4.1. However, the Parties have not reached an agreement on the amount to be paid. Accordingly, Plaintiff requests that the Court approve a Fee and Expense Amount of $597,380.50 to compensate Plaintiff's Counsel for pursuing the Action on a wholly contingent basis and achieving benefits for Arrow and its stockholders through the Settlement, which Arrow and its Board acknowledge are substantial. *See id.*, ¶¶1.3-1.4. As explained herein, this requested amount is dwarfed by the value conferred upon Arrow and its stockholders through the Reforms, which are conservatively estimated by Professor Korsmo to be worth more than $5 million. *See* Korsmo Decl., ¶14.[4] For these reasons, among others stated herein, Plaintiff requests the Court approve the requested Fee and Expense Amount.

"When assessing whether attorneys' fees are appropriate, courts consider the so-called *Goldberger* factors: (i) the benefit recovered in relation to the settlement; (ii) the magnitude and complexities of the litigation; (iii) the litigation risk; (iv) the quality of representation; (v)

4 Under Professor Korsmo's empirical study analysis, the requested Fee and Expense Amount is equal to just 11.95% of the most conservatively estimated $5 million value of the Reforms. Under Professor Korsmo's event study approach, the requested amount is equal to just 9.19% of the $6.5 million value of the Reforms. *See* Korsmo Decl., ¶¶53, 60

public policy considerations; and (vi) the time and labor spent." *CPI*, 2023 U.S. Dist. LEXIS 194625, at *20 (internal citation removed).

**A. The Benefit Recovered**

As detailed above, the Settlement concededly confers substantial benefits on Arrow by targeting corporate improvements in areas that are at the heart of Plaintiff's claims. As "the Court agrees, … the [Reforms] are tailored to specifically address Plaintiff's allegations regarding the alleged issuance of false and misleading statements, alleged internal control deficiencies, and the alleged failings of the officers and directors to prevent the misconduct by "strengthen[ing] the Company's internal control function, providing checks-and-balances on the Company's executives, ensuring all public statements are accurate, full, and truthful, and ensuring the Board is dedicated to the furtherance of the Company's mission-critical aims" in order to reduce the likelihood that the alleged misconduct will reoccur." ECF No. 25, at 9 (quoting ECF No. 22-1, at 23-24); *see also* McKenna Decl., ¶40; Korsmo Decl., ¶¶29-30, 49-51.

Among other things, the Reforms "can be expected to substantially reduce the chance of recurrence" of the same wrongdoing alleged in the Action which, for a company of Arrow's size, is "likely to be of far greater value to the company and its stockholders than any plausible monetary recovery." Korsmo Decl., ¶¶10, 47. In conducting an event study, Professor Korsmo conservatively estimated that a recurrence could cost the Company $43.1 million. *Id.*, ¶44. Recognizing that a recurrence is not a certainty, Professor Korsmo applied a "hazard rate" of 20% to estimate that, absent any reforms, the expected loss due to a recurrence would be $8.6 million. *Id.*, ¶46. While Professor Korsmo concedes "[n]o reforms can entirely eliminate the chance of a recurrence," he noted that the Reforms "can be expected to substantially reduce the chance of recurrence." *Id.*, ¶47. Taking the reduced likelihood of a recurrence and applying it to the expected

loss identified above, Professor Korsmo conservatively estimated, in the event study approach, that "the value of the Reforms—in terms of the expected amount of loss they will avoid—would be $6.5 million." *Id.*, ¶52. In addition, the Reforms will "materially improve the Company's practices with respect to compliance, disclosure practices, and general board oversight." *Id.*, ¶55. Alternatively, the empirical evidence approach demonstrates "the effect [of the Reforms] on shareholder value is substantial," as "estimates of the premium investors are willing to pay for the types of governance improvements contained in the Reforms" could improve the Company's market capitalization, and thus increase shareholder value, by at least $5 million. *Id.*, ¶¶56, 60.

Furthermore, courts in stockholder derivative cases routinely award attorneys' fees that exceed those being sought in this Action where, as here, the settlement consists of valuable corporate governance measures. *See, e.g.*, *Cnty. of New York Employees Retirement Plan et al. v. Jung*, Index No. 651304/2010 (N.Y. Sup. Ct. Aug. 18, 2010) (awarding $4,000,000 fees for governance only settlement which included enhancements to the compliance committee, appointment of a new compliance officer, and creation of new certification program regarding case-specific issues);[5] *Merholz v. McMahon*, 3:20-cv-00557 (D. Conn. 2021) (awarding $3.65 million fee award for governance only settlement that included enhanced board reporting and improvements to certain existing policies); *Pacheco v. Guyer*, Case No. 1:18-cv-7999 (S.D.N.Y. Jan. 27, 2023) (awarding $2.45 million fee award for governance only settlement which included enhancements to board independence, composition, diversity, and functioning, enhancements to the Company's internal controls over public disclosures, enhancements to the company's internal processes related to clinical trials, insider trading policy improvements, clawback policy improvements, appointment of chief compliance officer, and publication of certain internal

---

[5] All unreported cases herein are attached to the McKenna Declaration as Exhibits C-O.

governance policies); *In re 22nd Century Group, Inc. Derivative Litig.*, Case No. 1:19-cv-00479-JLS (W.D.N.Y. 2025) (awarding $768,333 fee award for governance only settlement involving enhancements to committee charters and policies to improve the company's disclosure controls and oversight responsibilities, including improvements to the public disclosure committee and audit committee, improvements to the officers' oversight responsibilities, the adoption of a press release review and approval policy, and additional enhancements to the board's composition and practices).[6]

The requested Fee and Expense Amount is also less than the reported median attorneys' fee award of $760,000 in parallel derivative lawsuits that settled for governance only (which accounts for 75% of all derivative settlements).[7]

In sum, Plaintiff respectfully submits that the requested Fee and Expense Amount is eminently reasonable in light of the substantial benefits Arrow and its Board concede it obtained, and in light of fees awarded in similar derivative settlements where valuable corporate governance reforms (like the Reforms here) were achieved.

### B. The Magnitude and Complexities of Risky Litigation

---

6 *See also In re OSI Sys., Inc. Derivative Litig*, 2017 U.S. Dist. LEXIS 221033, *3 (C.D. Cal. May 2, 2017) ($1,600,000 fee award approved in governance only settlement that required enhanced board independence, strengthened training for officers and directors, enhanced oversight and consideration of compliance); *In re Geron Corp. S'holder Derivative Litig.*, 2023 Del. Ch. LEXIS 178 (Del. Ch. May 17, 2023) (awarding fees of $1.35 million for corporate governance reforms that sought to improve the company's disclosure controls and regulatory compliance); *Ingrao v. Fieldly, et al.*, Case No. A-23-8737360C (Nev. Dist. Ct. Mar. 26, 2025) (awarding fees of $987,500 for governance only settlement that required establishment of a management-level disclosure Committee, improvements to the audit and compensation committees, an enhanced internal controls and compliance function, and improved director education).

7 *See* Laarni T. Bulan, et al., *Parallel Derivative Action Settlements Update: August 2025*, Cornerstone Research (Aug. 2025), https://www.cornerstone.com/insights/research/parallel-derivative-action-settlements-update-august-2025/.

It is well-recognized that "as a derivative shareholder suit, the many defenses available and opportunities to reduce or rebut any findings of liability or damages make this litigation complicated." *Fab Universal*, 148 F. Supp. 3d at 283. In addition to the complexities inherent in derivative litigation, this Action involved alleged internal control deficiencies over financial reporting, thus requiring Plaintiff to navigate and understand, *inter alia*, Arrow's financial reporting requirements and controls. Complexity is added to this given that Arrow is a publicly traded company operating in the highly regulated financial industry, meaning the internal control and disclosure deficiencies may have further impacted more of Arrow's mission-critical functions. McKenna Decl., ¶43. Continued litigation would have required Plaintiff to engage not only in substantial fact discovery, but also significant expert discovery to address these alleged deficiencies, thus underscoring the complexities present in the Action. *Id*.

As explained above, Plaintiff faced a number of risks in continuing to litigate this complex derivative litigation, including overcoming the Rule 23.1 demand futility challenges, overcoming the business judgment rule, and proving liability and damages at the motion to dismiss, summary judgment, and trial stages. "Nearly all these risks stem from the fact that 'derivative actions are notoriously difficult and unpredictable.'" *Fab Universal*, 148 F. Supp. 3d at 284 (quoting *Republic Nat. Life Ins. Co. v. Beasley*, 73 F.R.D. 658, 667 (S.D.N.Y. Feb. 24, 1977)).

Despite these risks and complexities, Plaintiff's Counsel accepted the Action on a wholly contingent basis, advancing all necessary expenses, with the knowledge that their efforts may go uncompensated should the Action be unsuccessful. McKenna Decl., ¶45; *see In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 2015 U.S. Dist. LEXIS 152668, at *27-28 (S.D.N.Y. Nov. 9, 2015) (noting the risk of litigation favors the requested fees where, as here, "Counsel undertook to represent the Class on a contingent-fee basis, facing a very real possibility of obtaining

no compensation whatsoever in this highly complex matter.”). Indeed, Plaintiff's Counsel “invested extensive time and costs with no guarantee of success,” thus “the requested award is commensurate with the risks of litigation.” *Pickard v. Onsite Facility Servs., LLC., et al.*, Case No. 5:22-cv-207 (AMN/ML) (N.D.N.Y. Oct. 25, 2023) (Nardacci, J.).

**C. <u>Quality of Representation</u>**

Plaintiff's Counsel has extensive experience and achieved significant results for companies and stockholders across the country as reflected by their firm résumé previously submitted. *See* ECF No. 22-4. Further, while facing the daunting challenges of establishing demand futility and liability (as described *supra*), Plaintiff's Counsel successfully negotiated an outstanding settlement with sophisticated and experienced Defendants' Counsel. This minimized Arrow's financial burden associated with protracted litigation, while securing substantial benefits for the Company which directly address the wrongdoing alleged in the Action and will confer long lasting benefits on the Company and its stockholders. McKenna Decl., ¶47; *see* Korsmo Decl., ¶¶14, 30, 49-51, 55-56, 60; *See Fab Universal*, 148 F. Supp. 3d at 284 (finding that a settlement reached “through adversarial negotiation with and litigation against highly competent and experienced defense counsel … evidences that the quality of representation is high in this case.”).

**D. <u>Public Policy Considerations</u>**

“[T]he purpose of the derivative action was to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers.” *Kamen*, 500 U.S. at 95; *Fab Universal*, 148 F. Supp. 3d at 284 (finding the fee award “incentivizes counsel to take such matters on contingency, further promoting compliance with commercial law by increasing the likelihood of enforcement.”); *In re AOL Time Warner S'holder Derivative Litig.*, 2009 U.S. Dist. LEXIS

124372, at *70 (S.D.N.Y. Feb. 1, 2010) (finding the fee award incentivizes "future counsel to devise remedies as an alternative to money, strengthening corporate America in the long run through innovation and prophylaxis"). Accordingly, public policy considerations undoubtedly favor the requested Fee and Expense Amount.

### E. <u>The Time and Labor Expended by Plaintiff's Counsel</u>

Although the focus of fee awards in shareholder derivative litigation is the benefit conferred upon the Company, the final *Goldberger* factor to be addressed is the time and labor expended by Plaintiff's Counsel as a "cross-check." *CPI*, 2023 U.S. Dist. LEXIS 194625, at *21. Since its inception in 2023, Plaintiff's Counsel spent 385.20 hours on the Action, totaling $298,690.25 in lodestar. McKenna Decl., ¶54. Accordingly, the requested Fee and Expense Amount here results in a net lodestar multiplier of 1.9x. *Id.*, ¶64.

"In shareholder litigation, courts typically apply a multiplier of 3 to 5 to compensate counsel for the risk of contingent representation." *Cohn*, 375 F. Supp. 2d at 862. Indeed, the requested net multiplier here of 1.9x is therefore well below the range that courts typically award in similar cases. *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa, U.S.A., Inc.*, 396 F.3d 96, 123 (2d Cir. 2005) (affirming multiplier of 3.5); *James v. China Grill Mgmt.*, 2019 U.S. Dist. LEXIS 72759, at *8 (S.D.N.Y. Apr. 30, 2019) (approving multiplier of 3.53x and collecting cases where multipliers ranged from 2x to 4.9x); *City of Providence v. Aeropostale, Inc.*, 2014 U.S. Dist. LEXIS 64517, at *38-39 (S.D.N.Y. May 9, 2014) (noting that "lodestar multiples of over 4 are awarded by this Court"); *Maley v. Dale Global Techs. Corp.*, 186 F. Supp. 2d 358, 371 (S.D.N.Y. 2002) (describing as "modest" a "fair and reasonable" 4.65 multiple); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 354 (S.D.N.Y. 2005) (awarding multiplier of 4); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (awarding 3.97 multiplier and noting multipliers

between 3 and 4.5 are common); *Velez v. Novartis Pharms. Corp*., 2010 U.S. Dist. LEXIS 125945, at *64 (S.D.N.Y. Nov. 30, 2010) (awarding multiplier of 2.4, which "falls well within (indeed, at the lower end) of the range of multipliers accepted within the Second Circuit") (collecting cases approving multipliers from 2.09 to 5.5).

This Court has also recognized similar multipliers are reasonable in contingent fee actions. *See, e.g.*, *Pickard*, Case No. 5:22-cv-207(AMN/ML) (Nardacci, J.) (granting requested fee award with multiplier of 1.56x); *Koeller, et al. v. Numrich Gun Parts Corp.*, Case No. 1:22-cv-00675-DNH-CFH (N.D.N.Y. May 31, 2024) (granting requested fee award with multiplier of 2.9x); *Smith v. JKS Home Improvement, LLC, et al.*, Case No. 3:23-cv-01509 (AMN/ML) (N.D.N.Y. May 12, 2025) (Nardacci, J.) (granting requested fee award with 1.07x multiplier).

Further, Plaintiff's Counsel's hourly rates are reasonable in light of the current market rate for lawyers litigating similar complex actions. McKenna Decl., ¶56.[8] Here, Plaintiff's Counsel's rates are based upon, among other things, a review of hourly rates at peer law firms. *Id*. As such, Plaintiff's Counsel's rates for this case have been between $200-$995 per hour. *Id.*, ¶¶54, 56-57. Similar, or higher, billing rates have been approved as reasonable in comparable litigation, including by this Court. *See, e.g.*, Securities Class Action, ECF No. 41-4, ¶4 (billing rates between $475-$1,000 per hour); *Faber, et al. v. Cornell University*, Case No. 3:20-cv-00467 (MAD/ML)

[8] While the Second Circuit's "forum rule" generally requires use of the hourly rates employed in the district in which the reviewing court sits, a district court may apply an out-of-district rate if a reasonable client would have selected out-of-district counsel because doing so would likely produce a substantially better net result. *See Eileen Grays LLC v. Remix Lighting, Inc.*, 2019 U.S. Dist. LEXIS 209445, at *14-16 (N.D.N.Y. Dec. 5, 2019). Here, Plaintiff is unaware of any counsel that regularly specializes in shareholder derivative matters based in this District. *See* McKenna Decl., ¶57, n.6.

(N.D.N.Y. Oct. 26, 2023) (billing rates between $225-997); *In re 22nd Century*, Case No. 1:19-cv-00479-JLS (billing rates between $176-$1,225); *see also* McKenna Decl., ¶56.[9]

The time expended on the Action is also reasonable. Plaintiff's Counsel devoted 385.20 hours to this Action over the course of two years. McKenna Decl., ¶54. Although this Action did not move into contested discovery, there were significant negotiations and related activities through the settlement process, such as reviewing volumes of public and confidential corporate governance. McKenna Decl., ¶52. In addition, the number of hours spent on this Action were necessary to achieve the Settlement because, as explained above, the Action involved, among other things, (i) a review of a complex set of facts involving Arrow's internal controls over financial reporting that Plaintiff's Counsel was required to understand; (ii) an investigation of the facts and legal claims asserted in the Action prior to and during the drafting of the complaint; (iii) negotiations with Defendants' Counsel as to an appropriate stay of the Action; (iv) numerous rounds of back-and-forth negotiations with Defendants' Counsel as to the Reforms to be implemented; (v) an investigation of the Company's existing corporate governance, which included a close review of confidential internal documents; (vi) researching effective corporate governance relevant to the Action; (vii) the memorialization of the material Settlement terms; (viii) communicating with the Plaintiff throughout the litigation and settlement process; and (ix) other tasks, such as drafting and filing status reports and monitoring developments in the Securities Class Action. *Id*. Additionally, the time spent on this Action is entirely reasonable when compared against the number of hours spent in other derivative actions that settled at similar procedural

---

[9] This Court has also approved a *de facto* hourly rate of $1,408.28 for both attorney and paralegal time, finding that such *de facto* hourly rates are not considered to be an undue windfall in a case with experienced counsel who provided quality and efficient representation. *Regina M. v. Comm'r of Soc. Sec.*, 2024 U.S. Dist. LEXIS 68687, at *5 (N.D.N.Y. Apr. 16, 2024) (Nardacci, J.). Plaintiff's Counsel's *de facto* hourly rate here is approximately $775.42.

postures. *See, e.g.*, *id.*, at ¶55; *In re 22nd Century*, Case No. 1:19-cv-00479-JLS (1,727 hours); *Sciabacucchi v. Howley*, 2023 Del. Ch. LEXIS 164, at *11 (729.4 hours in a case that "settled right out of the gate."); *Allred*, 2021 U.S. Dist. LEXIS 236249, at *20 (647 hours); *Scott*, 2021 U.S. Dist. LEXIS 90861, at *10 (887 hours).

Furthermore, Plaintiff's Counsel incurred $25,352.28 in expenses in connection with this Action. These expenses were each reasonable and necessary to achieve the substantial benefits in this Action and are of the type that courts routinely agree are reasonable. McKenna Decl., ¶¶61-62; *see Fab Universal*, 148 F. Supp. 3d at 284-85 ("It is well-settled that attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were incidental and necessary to the representation of those clients.") (internal citations omitted); *CPI*, 2023 U.S. Dist. LEXIS 194625, at *21 (noting that such expenses "are permissible and routine in this context.").

Based upon the substantial benefits conferred on the Company and Current Arrow Stockholders, the time and expense incurred by Plaintiff's Counsel, and the lack of any objections to date, Plaintiff respectfully submits that the Fee and Expense Amount is more than reasonable and should be approved by the Court.

## VI. THE SERVICE AWARD SHOULD BE APPROVED

Plaintiff's Counsel also request that Plaintiff be granted a modest service award of $5,000 to be deducted from the Fee and Expense Amount. "Courts in this Circuit routinely award … costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." *Allred*, 2021 U.S. Dist. LEXIS 236249, at *21 (quoting *Fab Universal*, 148 F. Supp. 3d at 285).

Here, for the two years that the Action has been pending, Plaintiff has been actively engaged in and contributed to the Action and resulting Settlement. Indeed, Plaintiff has faithfully: (i) reviewed the complaint prepared on his behalf and authorized the Action to be commenced; (ii) regularly communicated with Plaintiff's Counsel regarding the status, strategy, and progress of the Action; and (iii) communicated with Plaintiff's Counsel regarding settlement negotiations and the mediation efforts and approved the same. McKenna Decl., ¶66, Ex. B. Further, Plaintiff was prepared to continue with litigation if required to do so. *Id.* Additionally supporting the reasonableness of the Service Award is that the award will "be paid from the Fee and Expense Amount." Stip., ¶4.3; *In re Presidential Life Sec.*, 857 F. Supp. 331, 337 (S.D.N.Y. 1994) (explaining that incentive awards "need not be subjected to intense scrutiny inasmuch as these funds will come out of the attorney's fees"). Thus, the requested Service Award merits approval.

## VII. CONCLUSION

The Settlement of the Action provides an excellent resolution for the Company through the implementation of the Reforms which will substantially benefit the Company for five years. The requested fee is a modest percentage of the value of the Reforms. Plaintiff respectfully submits that the Settlement is fair, adequate, and reasonable and request that the Court finally approve the Settlement, the Fee and Expense Amount, and Service Award.

Dated: December 8, 2025

**GAINEY McKENNA & EGLESTON**

By: */s/ Thomas J. McKenna*
Thomas J. McKenna
Gregory M. Egleston
Christopher M. Brain
260 Madison Avenue, 22nd Floor
New York, NY 10016
Telephone: (212) 983-1300
Email: tjmckenna@gme-law.com

Email: gegleston@gme-law.com
Email: cbrain@gme-law.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing has been served upon opposing counsel, via the Court's CM/ECF e-mail notification system, on December 8, 2025.

*/s/ Thomas J. McKenna*
Thomas J. McKenna